IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DENISE LANTON,  )
  )
       Plaintiff,  )
  )  Case No. 16 C 2351
       v.  )
  )
CITY OF CHICAGO,  )
  )
       Defendant.  )

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff Denise Lanton brings this lawsuit against her employer, Defendant City of Chicago, alleging race and sex discrimination claims in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (Title VII), and an age discrimination claim in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 612, *et seq.* ("ADEA") based on the City denying Lanton a promotion in May 2014. Lanton also brings a due process claim based on the Illinois Constitution pursuant to the Court's supplemental jurisdiction. *See* 28 U.S.C. § 1367(a). Before the Court is Defendant's motion for summary judgment brought pursuant to Rule 56(a). For the following reasons, the Court grants Defendant's motion in its entirety.[1]

### BACKGROUND

**I.    Introduction**

Lanton was born on May 8, 1956 and is an African-American woman. (R. 64, Def.'s Stmt. Facts ¶ 3.) She began working for the City in 1988 as a paralegal in the City's Law Department. (*Id.* ¶ 4.) In 1994, Lanton became an Assistant to the Commissioner in the City's

---

[1] In her response brief, Lanton moves for summary judgment as to her due process claim based on the alleged deprivation of her property rights. The Court denies this late-filed "motion" for the same reasons it is granting Defendant's summary judgment motion on this count.

Department of Streets and Sanitation ("Streets and Sanitation").  (*Id*. ¶ 5.)  In 1999, Lanton's job title in Streets and Sanitation was changed to Administrative Services Officer II, which is Lanton's current job title with the City.  (*Id.* ¶ 6.)  The Administrative Service Officer II position is a "career service" position with certain procedural protections, as opposed to an appointed position that is at-will.  (*Id.* ¶ 7; R. 64-5, Ex. C, Williams Dep., at 8-9.)

Streets and Sanitation is the City's department that is responsible for garbage pick-up, snow removal, graffiti removal, rodent control, traffic services, and the maintenance of trees within the City.  (*Id.* ¶ 8.)  During the relevant time period, Streets and Sanitation was led by Commissioner Charles Williams ("Williams").  (*Id.* ¶ 9.)  Also, James Crocker ("Crocker") is the Deputy Commissioner of Streets and Sanitation's Administration Bureau and is responsible for managing the administrative functions within the department.  (*Id.* ¶ 10.)  Soo Choi ("Choi") is the Commissioner of the Department of Human Resources ("DHR").  (*Id*. ¶ 11.)  DHR is responsible, in part, for the hiring oversight within the City.  (*Id*.)  Also during the relevant time period, Christina Batorski ("Batorski") was DHR's Deputy Commissioner of the Employment Services Division.  (*Id*. ¶ 12.)  Her duties included managing a team of employees responsible for handling the hiring sequences of the City's operating departments.  (*Id*.)

## II.     Shakman Decree

In 1969, the City was named as one of the defendants in a federal lawsuit entitled *Michael Shakman, et al. v. Democratic Organization of Cook Cnty., et al*., 69 C 2145, filed in the United States District Court for the Northern District of Illinois.  (*Id*. ¶ 16.)  In 1972, the City and its Mayor entered into a Consent Decree – commonly referred to as the "Shakman Decree" – that prohibited the City from "conditioning, basing or knowingly prejudicing or affecting any term or aspect of government employment with respect to one who is a government employee, upon or

2

because of any political reason or factor." (*Id.*) In 1983, pursuant to a Consent Judgment, these prohibitions were extended to the City's hiring practices. (*Id.*) On August 2, 2005, the district court assigned a monitor to the *Shakman* lawsuit, commonly referred to as the "Shakman Monitor" to ensure the City's future compliance with the Shakman Decrees. (*Id.* ¶ 17.) The district court directed the Shakman Monitor to study the City's existing employment practices, policies, and procedures for non-political hiring, promotion, transfer, discipline, and discharge and then propose a mechanism for ensuring that the City's future employment actions are in compliance with the court's orders. (*Id.*) The district court then appointed Noelle Brennan ("Brennan") as the Shakman Monitor. (*Id.*) The City developed its Hiring Plan, discussed in detail below, pursuant to the Shakman Decree.[2] (R. 64-8, Choi Dep. Ex. 2, Hiring Plan, at 4.)

### III. Shakman Monitor's Investigation

Relevant to this lawsuit, the Shaman Monitor investigated six Streets and Sanitation employees, including Lanton. (Def.'s Stmt. Facts ¶ 21.) As part of the Shakman Monitor's investigation, on November 6, 2012, individuals within the Monitor's office interviewed Lanton. (*Id.* ¶ 19.) At that time, Lanton was represented by an attorney, placed under oath, and acknowledged that she understood her rights. (*Id.*) Also, a court reporter generated a verbatim transcript of the interview. (*Id.*) At the conclusion of the Shakman Monitor's investigation, the Monitor's office prepared a "Report of Monitor's Investigation" for each individual who was investigated. (*Id.* ¶ 20.) The reports contained disciplinary recommendations that were directed to the heads of the departments where each employee worked. (*Id.*) The department heads then had the discretion to accept or reject the Shakman Monitor's recommendations. (*Id.*) At the

---

[2] As Judge Shadur recognized last year, "[o]ver a period of nearly a half century (the case was originally filed in 1969 as Case No. 69 C 2145)," the Shakman Decree's "scope has evolved (and expanded) substantially." *Hardy v. City of Chicago,* No. 15 C 1174, 2017 WL 1652590, at *1 n.1 (N.D. Ill. May 2, 2017).

conclusion of the investigations, the monitor provided Commissioner Williams with copies of each "Report of Monitor's Investigation" for the six Streets and Sanitation employees. (*Id*.) As to Lanton, the Shakman Monitor concluded:

> In light of the evidence, the Monitor's office has serious doubts about the veracity of Lanton's testimony. We request that a copy of this memo be placed in Lanton's personnel file for appropriate consideration in the event Lanton is implicated in future hiring violations. *We further request that the City consider excluding Lanton from the hiring process in its entirety, including, but not limited to, screening, interviewing, and/or participating as a subject matter expert in hiring matters*. Finally, we request that the City and Inspector General's Office review this memo, Lanton's interview transcript, and [Streets and Sanitation employee William] Mahon's interview transcript to determine whether further investigation is warranted.

(*Id*. ¶ 22.) (emphasis added).

After reviewing this recommendation, Commissioner Williams decided that Lanton should be excluded from any involvement in the hiring process. (*Id*. ¶ 23; Williams Dep., at 43.) On the other hand, Commissioner Williams did not conduct an independent investigation into Lanton's misconduct. (R. 69, Pl.'s Stmt. Add'l Facts ¶ 1.) As to the other five Streets and Sanitation employees, Commissioner Williams terminated one individual and excluded the others from the hiring process. (Def.'s Stmt. Facts ¶ 24.) Also, Commissioner Williams issued the following discipline: (1) William Mahon received a 45-day suspension; (2) Steven Morales received a 14-day suspension; (3) Danny Munoz, Jr. received a written reprimand; and (4) Chris Sauve received a 10-day suspension. (*Id.* ¶ 25.) On August 8, 2013, Commissioner Williams prepared a memorandum identifying the five individuals who were to be excluded from involvement in the hiring process, namely, Lanton, Mahon, Morales, Munoz, and Sauve. (*Id*. ¶ 26.) In August 2013, Lanton was then notified that she could no longer take part in the hiring

4

process as part of her job duties, and Commissioner Williams' August 8, 2013 memorandum was placed in her personnel file. (*Id.* ¶ 27.)

## IV. City of Chicago Hiring Process

Pursuant to the Shakman Decree, the City maintains a detailed Hiring Plan to ensure a fair hiring process that is designed to minimize the risk of patronage hiring. (*Id.* ¶ 28.) More specifically, the Hiring Plan states that the City of Chicago is committed to hiring practices that:

- Base employee selection on a Candidate's knowledge, skills and ability to perform effectively on the job;

- Provide equal employment opportunity to all qualified Applicants;

- Prohibit the entry of Political Reasons or Factors or other Improper considerations into any stage of the selection and hiring processes for Covered Positions;

- Provide the Hiring Authority with maximum lawful discretion in making selection decisions; and

- Create a transparent hiring system that minimizes the ability to manipulate employment decisions.

(Choi Dep., Ex. 2, Hiring Plan, at 4.) The Hiring Plan defines the Hiring Authority as "the individual who has the ultimate responsibility and authority for the hiring of a candidate. This role will typically be held by a Department Head." (*Id.*, Ex. 2, Hiring Plan, at 6.) Also, the Hiring Plan states that it "is not an exhaustive document and cannot contemplate every variation that could occur in hiring" and "[t]he principles of this Hiring Plan should be construed broadly." (*Id.*, Ex. 2, Hiring Plan, at 5.)

Chapter V of the Hiring Plan is the relevant Chapter in this lawsuit because it sets forth the general hiring process for filling positions within the City that require an interview, such as the position for Labor Relations Supervisor. (Def.'s Stmt. Facts ¶ 30; Pl.'s Stmt. Facts ¶ 3.) Under this Chapter, before a position is posted, the department wanting to fill a vacancy ("the

5

hiring department") seeks DHR's approval to open the vacancy. (Def.'s Stmt. Facts ¶ 31.) An assigned DHR Recruiter – the individual responsible for initiating and navigating the hiring process – participates in an intake meeting with individuals from the hiring department to identify the hiring department's needs and the qualifications required for the position in order to finalize the job posting. (*Id*.) The DHR then posts the job opening for a minimum of two weeks and receives applications from interested applicants. (*Id*. ¶ 32.)

After the job posting period closes, the assigned DHR Recruiter reviews the applications against the minimum qualifications and preferences of the hiring department, and then generates a referral list consisting of the best qualified candidates. (*Id*. ¶ 33.) The DHR then sends the referral list to the hiring department, after which it is hiring department's responsibility to schedule and conduct interviews. (*Id.* ¶ 34.) Interviews are typically conducted in person and each interview consists of a pre-screened set of questions. (*Id*. ¶ 35.) At the completion of the interviews, each interviewer completes a comprehensive form detailing his or her assessment of the answers to the interview questions. (*Id*.) After the interviews are completed, the DHR Recruiter meets with the hiring department to conduct a consensus meeting to discuss and rank the candidates. (*Id*. ¶ 36.) The consensus meeting typically results in the generation of a pre-qualified candidate list, which ranks all of the qualified candidates in order of preference. (*Id.* ¶ 37.) Chapter V of the Hiring Plan specifically states that "[i]f a hiring department choses to utilize an active Pre Qualified Candidate list, the position will not be reposted, and the Pre-Qualified Candidate will be hired in order of their respective ranking on the list while their applications remain active, subject to the terms of the CBA [collective bargaining agreement]." (Pl.'s Stmt. Facts ¶ 12.) The hiring department usually gives the first person identified on the pre-qualified candidate list a conditional job offer, and if the first candidate accepts, the

conditional offer triggers an additional review process, including, but not limited to, a background check and drug and alcohol screening. (Def.'s Stmt. Facts ¶ 38.) If the first candidate declines the conditional offer, the hiring department moves to the next candidate on the pre-qualified list. (*Id.*)

**V.      2014 Labor Relations Supervisor Opening**

In early 2014, Streets and Sanitation began the process for hiring a Labor Relations Supervisor. (*Id.* ¶ 42.) This position functions as the labor/employee relations administrator for the entire department. (*Id.*) Commissioner Williams testified that the Labor Relations Supervisor's duties include working with the unions, handling disciplinary and grievance hearings, and participating in the negotiations of the various union CBAs. (Williams Dep., at 10, 36, 38.) For the intake meeting, the hiring manager, Deputy Commissioner Crocker, and former Labor Relations Supervisor Michael Garrity ("Garrity") met with DHR Recruiter Devetta Smith ("Smith") to discuss the criteria and qualifications for this position and to finalize the job posting. (*Id.* ¶ 43.) The Labor Relations Supervisor position was then posted on February 17, 2014. (*Id.* ¶ 44.) The February 2014 job announcement/posting for the Labor Relations Supervisor sets forth "essential duties," including, but not limited to: (1) performing the full range of employee and labor relation functions including administering bargaining unit contracts and the employee grievance and disciplinary processes; (2) administering the employee grievance and disciplinary process at the departmental level; and (3) coordinating and monitoring reduction in force actions to ensure compliance with CBAs and city personnel rules. (Pl.'s Ex. D, 2/14 Job Announcement.) This position, unlike the Administrative Services Officer II position, is exempt from career service. (*Id.*) Lanton applied for the Labor Relations Supervisor

7

position and her name was included on DHR's referral list for interviews. (Def.'s Stmt. Facts ¶ 46.)

On May 8, 2014, Crocker, Garrity, and another individual interviewed Lanton and the other candidates on the referral list for the Labor Relations Supervisor position. (*Id.* ¶ 47.) At the conclusion of the interviews, the interviewers conducted the consensus meeting on May 14, 2014 with Smith and created a pre-qualified candidate list. (*Id.* ¶ 48.) The first individual on the pre-qualified candidate list was Jose Ruiz and the second candidate on the list was Lanton. (*Id.*) Thereafter, the department gave Jose Ruiz a conditional offer, but he withdrew his name from consideration. (*Id.* ¶ 49.) On May 19, 2014, Director of Personnel Maria Contreras notified Lanton that her name was next on the pre-qualified candidate list, and asked if she was still interested in the position. (*Id.*) On May 27, 2014, Lanton and Contreras had a discussion about a start date of June 1, 2014, at which time Contreras informed Lanton that she did not know when Lanton would start. (Pl.'s Stmt. Facts ¶ 5; R. 64-3, Ex. B, Lanton Dep., at 81.)

In the interim, Commissioner Williams became aware that Lanton was being considered for the Labor Relations Supervisor position and that Lanton was one of the individuals excluded from being involved in the hiring process pursuant to the Shakman Monitor's recommendation. (Def.'s Stmt. Facts ¶ 50.) Commissioner Williams spoke with DHR's Deputy Commissioner Batorski, after which she confirmed that Lanton was one of the individuals excluded from the hiring process and that the Labor Relations Supervisor position was connected to the hiring process. (*Id.* ¶ 52.) Batorski testified that the Labor Relations Supervisor position's duties related to the hiring process because of the supervisor's direct involvement with layoffs and grievances procedures. (R. 64-10, Ex. F, Batorski Dep., at 60.) As such, Batorski concluded that Lanton should not have been deemed eligible for the position and that Lanton's name on pre-

8

qualified candidate list was a mistake. (Def.'s Stmt. Facts ¶¶ 52, 69.) In addition, Commissioner Williams spoke with DHR Commissioner Choi about the situation and Commissioner Choi shared her concern that offering Lanton the position would be in conflict with the Shakman Monitor's recommendations. (*Id.* ¶ 53.) On May 22, 2014, Commissioner Choi sent the following email to Commissioner Williams:

> As you know, the Monitor's Office issued the attached report regarding Ms. Lanton, which states the following in its conclusion: "We [] request that the City exclude Lanton from the hiring process in its entirety…." The City, in response to this report, agreed to this recommendation.
>
> I spoke with Noelle Brennan, the Monitor, on the phone today regarding Ms. Lanton and the Labor Relations Supervisor position. Without hesitation, Ms. Brennan immediately expressed her opinion that the nature of this position's duties does have enough of a connection to the hiring process such that giving her the position "would be a problem" given the report and the City's agreement to exclude Ms. Lanton from the hiring process. Ms. Brennan also told me that the fact that this was caught prior to hiring Ms. Lanton into the position was a positive sign that the safeguards the City has so carefully put in place were working.
>
> In light of the Monitor's report, the nature of the duties of the Labor Relations Supervisor position as they relate to the hiring process, and my conversation with Ms. Brennan, I advise that Ms. Lanton not be given the position.
>
> Ultimately, the decision is yours, but my hope is that you will seriously consider my advisement in making your final decision. If you would like to discuss further, please don't hesitate to contact me.

(*Id.* ¶ 56.)

Approximately three weeks after the May 14, 2014 consensus meeting, Commissioner Williams informed Deputy Commissioner Crocker that the hiring process for the Labor Relations Supervisor was to be stopped and the position was to be reposted because he and the DHR had concluded that Lanton was not eligible for the position. (Pl.'s Stmt. Facts ¶ 6; R. 64-9, Ex.

9

Croker Dep., at 30-32; Def.'s Stmt. Facts ¶ 58.) Lanton never worked as the Labor Relations Supervisor for the Streets and Sanitation Department. (*Id*. ¶ 59.)

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quotation omitted). If the non-moving party "'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' summary judgment must be granted." *Blow v. Bijora, Inc.,* 855 F.3d 793, 797–98 (7th Cir. 2017) (quoting *Celotex,* 477 U.S. at 322).

## ANALYSIS

**I.     Race, Sex, and Age Discrimination Claims**

The City first argues that Lanton's employment discrimination claims are untimely. In her response brief, Lanton unequivocally states that "[a]ll of [P]laintiff's claims arise from the

10

denial of Plaintiff's promotion to the Labor Relations Supervisor position in May 2014." (R. 70, Resp. Brief, at 2.) Accordingly, Lanton's first EEOC Charge dated September 8, 2014 – filed well-within the 300 days of the alleged discriminatory action in May 2014 – is the relevant EEOC Charge. *See Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 890 (7th Cir. 2016). Lanton received her right-to-sue letter on April 30, 2015 and filed this lawsuit on February 17, 2016. Therefore, Lanton's race, sex, and age discrimination claims concerning the May 2014 denial of a promotion are timely.

Turning to the merits of Lanton's employment discrimination claims based on the May 2014 failure to promote, Lanton seeks to establish her claims based on the *McDonnell Douglas* indirect method of proof. As the parties acknowledge, however, the Seventh Circuit has called into question the distinction between the direct and indirect methods of proof in employment discrimination cases. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). Nonetheless, "[n]o matter the framework employed, the ultimate legal question 'is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Reed v. Freedom Mortg. Corp.,* 869 F.3d 543, 547 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765). "In applying this standard, evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Reed*, 869 F.3d at 547-48.

Lanton's arguments concerning her prima facie case and the City's proffered reason for failing to promote her to the position of Labor Relations Supervisor have considerable overlap, and thus the Court looks to the evidence as a whole in determining whether a reasonable factfinder would conclude that the City did not promote Lanton to the Labor Relations

11

Supervisor position based on her race, age, or sex. *See Lauth v. Covance, Inc.*, 863 F.3d 708, 715 (7th Cir. 2017). Construing the evidence and all reasonable inferences in Lanton's favor – as the Court is required to do at this procedural posture – there is little dispute that the City maintains it did not promote Lanton to the Labor Relations Supervisor position because Commissioner Williams concluded she was not eligible for the position due to the Shakman Monitor's recommendation excluding her from positions involving the hiring process.

What is disputed, however, is whether this proffered reason for the May 2014 adverse employment action was pretext for discrimination. More specifically, because the City has proffered a legitimate, non-discriminatory reason for not promoting Lanton, she must present evidence raising a triable issue of fact that this reason is pretext for discrimination. *See Ennin v. CNH Indus. Am., LLC,* 878 F.3d 590, 596 (7th Cir. 2017). "Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." *Monroe v. Indiana Dep't of Transp.*, 871 F.3d 495, 505 (7th Cir. 2017) (citation omitted). Moreover, "[t]he question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered for the adverse action." *Grant v. Trs. of Indiana Univ.*, 870 F.3d 562, 570 (7th Cir. 2017) (citation omitted).

To establish pretext, Lanton points to evidence in the record concerning another Streets and Sanitation employee, Chris Sauve, who is male, white, and in his mid-40s. (Def.'s Stmt. Facts ¶ 25.) In February 2016 – over a year and a half after Commissioner Williams did not promote Lanton – he appointed Sauve to the newly-created position of Deputy Commissioner of Sustainability in Streets and Sanitation involving the City's recycling program, even though Sauve had been excluded from the hiring process via the Shakman Monitor's recommendation.

12

(*Id.* ¶ 70.) Commissioner Williams testified that does not believe that offering Sauve the Deputy Commissioner of Sustainability position violated Sauve's exclusion from the hiring process, and he further believes that Sauve is capable of doing the job without participating in the hiring process in any way. (*Id.* ¶ 71.) Also, Commissioner Williams testified that the at-will, Shakman-exempt position of Deputy Commissioner of Sustainability was a promotion for Sauve and that he did not communicate with the Shakman Monitor about promoting Sauve to this position.[3] (Pl.'s Stmt. Facts ¶ 19; Williams Dep., at 15, 80, 86.) Commissioner Williams further testified that this new position was a result of the need for a more robust recycling program. (Williams Dep., at 77-78, 81.) While Sauve's position as Deputy Commissioner of Sustainability would normally require some participation in the hiring process, the Department substitutes other employees in lieu of Sauve when such participation is necessary. (Pl.'s Stmt. Facts ¶¶ 31, 32.)

Based on this evidence, Lanton argues that although Commissioner Williams "carved out" the hiring duties for Sauve, he did not carve out the hiring duties of the Labor Relations Supervisor so that she could be promoted to that position. As Commissioner Williams testified, however, the Labor Relations Supervisor position involved too many hiring duties and if he carved out these duties, "there is nothing left to do." (Def.'s Stmt. Facts ¶ 58; Williams Dep., at 73.) In response, Lanton argues that Commissioner Williams' reasoning is not credible because Sauve's position as Deputy Commissioner of Sustainability "entailed more involvement in the hiring process" than the Labor Relations Supervisor – an argument that is not supported by the record or any reasonable inferences based on the record. In particular, Lanton's reliance on the

---

[3] "[A] Shakman exempt position mean[s] that it was excluded from the decrees prohibiting the [City] from making hiring decisions based on politics." *Wilson v. Cook Cnty.*, 742 F.3d 775, 778 (7th Cir. 2014).

fact that all Deputy Commissioners "are significantly involved in the hiring process" is not only unsupported by the record, but fails to recognize the distinct differences between the City's Departments and the Deputy Commissioners' various tasks. Moreover, undisputed evidence in the record shows that Sauve's role as the Deputy Commissioner of Sustainable was focused on the City's recycling processes, whereas the Labor Relations position directly involves working with employees, their unions, and negotiating CBAs, among other labor-related duties. Lanton's additional assertion that the Labor Relations position was "in many ways" identical to her job duties as Administrative Services Officer II is similarly unsubstantiated. Also, Lanton's argument that hiring is not a critical component of the Labor Relations Supervisor position because the original job announcement and job description did not expressly say that it "involved the hiring process" does not refute the fact that the actual job responsibilities of the Labor Relations Supervisor involve the hiring process.

Furthermore, Lanton maintains that Commissioner Williams carved out hiring duties for other employees in his Department, including the Deputy Commissioner of Forestry, an Assistant Commissioner, and a General Superintendent, despite the Shakman Monitor's recommendation concerning their involvement in the hiring process. Although it is undisputed that these individuals were subject to the Shakman Monitor's recommendation regarding the hiring process, Lanton's bare-boned argument does not provide sufficient details to make a meaningful comparison to the Labor Relations Supervisor job responsibilities. *See M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.,* 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."). In other words, viewing the evidence and all reasonable inferences in her favor, the

evidence Lanton relies upon simply does not support her conclusion. *See Houlihan v. City of Chicago,* 871 F.3d 540, 554 (7th Cir. 2017) ("speculation cannot defeat summary judgment").

Last, Lanton highlights what she describes as multiple inconsistencies about the sequence of events during the May 2014 hiring process to support of her argument that Commissioner Williams' reason for failing to promote her was pretext for race, age, and sex discrimination. These inconsistencies include that although Commissioner Williams testified that if he carved out the hiring process responsibilities from the Labor Relations Supervisor's duties there would be nothing left to do, when asked about the position's involvement in the hiring process he answered "[t]hat's difficult for me to say." (Pl.'s Smt. Facts ¶ 21.) Lanton refers to other isolated statements Commissioner Williams made at his deposition. Viewing these statements in Lanton's favor, she ignores the totality of Commissioner Williams' testimony, including that the Labor Relations Supervisor's duties include working with the unions, handling disciplinary and grievance hearings, and participating in the negotiations of the various union CBAs. Moreover, these isolated statements do not raise a reasonable inference that Commissioner Williams' reasoning in not promoting Lanton was phony, a lie, or not true. *See Forrester v. Rauland–Borg Corp.*, 453 F.3d 416, 418 (7th Cir. 2006) (in analyzing pretext, "the question is never whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational in taking the action for the stated reason, but simply whether the stated reason was his reason: not a good reason, but the true reason"). In addition, the inconsistencies upon which Lanton relies do not amount to "shifting explanations" for Commissioner Williams' decision not to promote her, especially because throughout his deposition he unequivocally stated that he did not promote her due to her ineligibility based on the Shakman Monitor's recommendation.

Examining the evidence and all reasonable inferences in Lanton's favor – including the

15

undisputed fact that Lanton's race, sex, or age was never mentioned during the 2014 hiring process and that Lanton never heard Commissioner Williams or any other supervisor make comments about her race, sex, or age – she has failed to present evidence raising a genuine dispute of material fact that Commissioner Williams' explanation for denying the promotion to Labor Relations Supervisor was pretext for sex, race, or age discrimination. The Court grants Defendant's summary judgment motion as to these claims.

## II. Due Process Claim

Next, Lanton brings a due process claim under the Illinois Constitution based on her alleged property interest in connection with the promotion to the Labor Relations Supervisor position. *See Rollins v. Ellwood,* 141 Ill. 2d 244, 275 (1990) ("The Illinois Constitution contains its own guarantee of due process to all persons (Ill.Const.1970, art. I, § 2), a guarantee which stands separate and independent from the Federal guarantee of due process."). Under Illinois law, "a person has a property interest in his job where he has a legitimate expectation of his continued employment based on a legitimate claim of entitlement." *Cromwell v. City of Momence*, 713 F.3d 361, 364 (7th Cir. 2013) (citation omitted). "To show a legitimate expectation of continued employment, a plaintiff must show a specific ordinance, state law, contract or understanding limiting the ability of the state or state entity to discharge him." *Rujawitz v. Martin,* 561 F.3d 685, 689 (7th Cir. 2009) (citation omitted); *see also Cromwell,* 713 F.3d at 364 ("establishing an expectation of continued employment requires a clear statement made in some 'substantive state-law predicate[.]'") (citation omitted).

That being said, under Illinois law, an employee does not have a property interest in a promotion unless the promoting authority has no discretion to choose among a list of candidates. *See United States v. City of Chicago*, 869 F.2d 1033, 1036 (7th Cir. 1989); *Bigby v. City of*

*Chicago*, 766 F.2d 1053, 1056-57 (7th Cir. 1985); *see also Moore v. Muncie Police & Fire Merit Comm'n*, 312 F.3d 322, 327 (7th Cir. 2002) ("We have also previously held that an employee has no property interest in a prospective promotion, even when placed on an eligibility or ranking list."). As the Illinois Appellate Court teaches:

> [W]hen the promoting authority has discretion to choose among candidates on a promotion list, an employee does not have a property interest in a prospective promotion by virtue of his or her name being on that list. This reasoning makes sense, given that it would be inconsistent with the expressed limits of due process protections to grant property interests to those who have no concrete claim of entitlement to a promotion but are instead at the mercy of an authority's discretion.

*Chamberlain v. Civil Serv. Comm'n of Vill. of Gurnee*, 18 N.E.3d 50, 62 (2d Dist. 2014) (collecting cases). The Illinois Appellate Court in *Chamberlain*, however, concluded that under the Fire Department Promotion Act, 50 ILCS 742/20(d), and the controlling CBA, the defendants in that matter had no such discretion, but instead were required to appoint the highest-ranking person on the promotion list. *See id*. at 62-63. Needless to say, the Fire Department Promotion Act does not apply to the facts of this case and the parties agree that there is no controlling CBA.[4]

Here, Lanton argues that evidence in the record "overwhelming shows that the City did not have such discretion" in its decision to promote her to the Labor Relations Supervisor. In particular, Lanton points to Chapter V of the Hiring Plan arguing that once the pre-qualified candidate list is created, the job position will not be reposted and the candidates will be hired in order of their respective ranking on the list. The specific section upon which Lanton relies reads as follows:

---

[4] Lanton also makes the cursory argument that the Hiring Plan does not grant the Hiring Authority discretion to "take away her expectation of a promotion" based on the Illinois Appellate Court's *Chamberlain* analysis. This is a distinction without a difference due to the controlling CBA and the Fire Department Promotion Act in that matter.

> If a hiring department choses to utilize an active Pre Qualified Candidate list, the
> position will not be reposted, and the Pre-Qualified Candidate will be hired in
> order of their respective ranking on the list while their applications remain active,
> subject to the terms of the CBA.

As the language in this section indicates, the hiring department has a choice whether to use the list. Also, this section does not have any mandatory language, such as "shall," requiring adherence to the list such as the Fire Department Promotion Act. *See Chamberlain*, 18 N.E.3d at 63; 50 ILCS 742/20(d). Accordingly, Lanton's interpretation of this section of the Hiring Plan is unavailing, especially when reading the Hiring Plan as a whole. *See Dahlstrom v. Sun–Times Media, L.L.C.,* 777 F.3d 937, 943 (7th Cir. 2015) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute.").

Lanton further argues that Chapter VI of the Hiring Plan, which relates to the general hiring process for senior managers, contains discretionary language, namely, the "Department Head may choose to reject all of the Candidates submitted for consideration," but Chapter V contains no such language. Based on this difference, Lanton asserts that under the cannons of statutory construction, when particular language is used in one section, but not in another, it is presumed that the difference is intentional. *See United States v. Johnson,* 875 F.3d 360, 367 (7th Cir. 2017). The *Johnson* decision also points out that "[s]tatutory interpretation is guided not just by a single sentence or sentence fragment, but by the language of the whole law, and its object and policy." *Id*. at 366 (citation omitted). Looking to the Hiring Plan as a whole, as well as its "object and policy," the plan unequivocally states that one of its main goals is to "[p]rovide the Hiring Authority with maximum lawful discretion in making selection decisions." Moreover, the City of Chicago Personnel Rules also state that their goal is to "[p]rovide the Hiring

Authority with maximum lawful discretion in making selection decisions."[5]  Furthermore, the Hiring Plan articulates that the "Hiring Authority" is "the individual who has the ultimate responsibility and authority for the hiring of a candidate" and this "role will typically held by a Department Head" – in this case Commissioner Williams.  The Hiring Plan states that it "is not an exhaustive document and cannot contemplate every variation that could occur in hiring" and "[t]he principles of this Hiring Plan should be construed broadly."  Thus, looking to the Hiring Plan as a whole, construing it broadly, and based on the unequivocal language granting the Hiring Authority with "maximum lawful discretion," the Hiring Authority has discretion whether to choose from the pre-qualified candidate list – or not – and thus Lanton does not have a property interest in the promotion to Labor Relations Supervisor.  *See City of Chicago*, 869 F.2d at 1036; *Chamberlain*, 18 N.E.3d at 62.

On a final note, Lanton's perfunctory argument that "it is uncontested that Plaintiff received no due process in connection with the denial and revocation of her promotion" does not change the Court's analysis because she has not established a protectable property interest in the first instance.  *See Citizens Health Corp. v. Sebelius*, 725 F.3d 687, 694 (7th Cir. 2013) ("the threshold question in any due process challenge is whether a protected property or liberty interest actually exists.").  The Court grants Defendant's summary judgment motion as to Lanton's due process claim based on the Illinois Constitution.

---

[5] https://www.cityofchicago.org/content/dam/city/depts/dhr/supp_info/HRpolicies/2014_PERSONNEL_RULES-FINAL_2014_v3.p (last visited on February 13, 2018).

## CONCLUSION

For these reasons, the Court grants Defendant's summary judgment motion brought pursuant to Rule 56(a) in its entirety. Civil case terminated.

**Dated:** February 13, 2018

                            **ENTERED**

                            _____
                            **AMY J. ST. EVE**
                            **United States District Court Judge**